IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| ABEL NOE DOMINGUEZ, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil Action No. 4:15-CV-935-O |
| | § | |
| LORIE DAVIS, Director,[1] | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## OPINION AND ORDER

Before the Court is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by petitioner, Abel Noe Dominguez, a state prisoner confined in the Correctional Institutions Division of the Texas Department of Criminal Justice (TDCJ), against Lorie Davis, director of TDCJ, Respondent. After considering the pleadings and relief sought by Petitioner, the Court has concluded that the petition should be denied.

**I. BACKGROUND**

In May 2009 Petitioner was indicted in Tarrant County, Texas, Case No. 1149721D, for capital murder involving the murder of Alma Garcia after entering her home. Adm. R., Clerk's R. 2, ECF No. 13-14. The state appellate court set out the factual and procedural background of the case as follows:

> Alma was the mother of four: two girls and two boys. J.J., a daughter from an earlier relationship, was eighteen; the other daughter, N.D., was fifteen. The boys, A. and N., were eight-year-old twins. J.J. was around eighteen months old when she and her mother moved in with Appellant and his parents. The other three children

---

[1] Effective May 4, 2016, Lorie Davis replaced Williams Stephens as director of the Correctional Institutions Division of the Texas Department of Criminal Justice. Pursuant to Federal Rule of Civil Procedure 25(d), Davis is automatically substituted as the party of record.

came later, after Alma, J.J., and Appellant had left his parents' home.

They moved into a house on Carnett Court in Fort Worth. Alma's older sister, Blanca, had signed a mortgage on the house so that Alma and her family could have a place of their own. Alma used the wages she and Appellant earned from their jobs to make the monthly mortgage payments. The few times Alma was unable to make the payments, Blanca made them for her. Approximately half of the thirty-year mortgage was paid off at the time of Alma's death in March 2009.

Appellant was a jealous man. Alma took care of her appearance, which made Appellant believe she was seeing another man. If she took too long at the grocery store, at the gym, or anywhere else, to him it meant that she must be having an affair. He warned her that she could not leave him until he decided he wanted her to. More than once, when Alma had problems with Appellant, Blanca reminded him that Blanca owned the house, and she advised him to leave Alma and the children there in peace.

On February 24, 2009, following an altercation, Appellant moved out, and Alma changed the lock on the front door.

The next week, J.J. and the twins were alone in the house when J.J. saw Appellant in the back yard with a ladder. J.J. stayed in the boys' room and heard Appellant try the back door and attempt entry through a dining room window. She phoned her mother.

Robert McWhorter lived in the house behind and one over from Alma's house, and they shared a portion of their backyard fences. Robert was in his backyard investigating what his dogs were barking at near the corner adjacent to Alma's yard when he saw Appellant near Alma's back door. Robert returned to his house, and looking out the kitchen window moments later, he saw Appellant, crouching on Alma's roof, apparently studying something.

Robert thought that was "real odd . . . very out of the ordinary" and it struck him "as something that was out of place." He walked around the corner to Carnett Court and stood in front of Alma's house. He saw nothing unusual there, so he returned to his own cul-de-sac and took a position between his house and a neighbor's for a better view.

Appellant was still on the roof. Again, Robert walked toward Alma's house, and this time Appellant passed him on the street coming from the other direction. They nodded at each other but did not speak; Appellant continued to his car—parked on Robert's cul-de-sac—climbed in, and drove away.

After J.J.'s phone call, Alma pulled into the cul-de-sac to look into her backyard. She spoke to Robert, and seemed "real upset."

2

The following Saturday night, March 7, 2009, the house on Carnett Court was empty. Alma and J.J. had gone to a friend's birthday party, the twins were across the street with a neighbor, and N.D. was at cheerleading practice. N.D. was the first to return home that evening; she retrieved her brothers and put them to bed in Alma's room, where they usually slept. Then she retired to the room she shared with her sister and turned on the television.

Around eleven o'clock, N.D. heard a noise on the roof, and her dog started barking at the window. When she looked out, she noticed that the ladder that usually lay on its side by the house was standing up against the roof. Nothing else appeared out of place, however, so after checking on her brothers, who had fallen asleep, she turned off her mother's television set and went to bed.

Alma and J.J. had stopped at Jack-in-the-Box on their way home and were eating in the girls' room when N.D. awoke briefly, saw that the time was three a.m., and fell back asleep. After Alma and J.J. finished eating, Alma went to her room and climbed into bed between the twins. J.J. put away the trash, said good night to her mother, and also went to bed.

N. woke to the bed shaking. He saw his dad on top of his mother, choking her. N. screamed, waking his brother. A. thought Appellant was punching Alma. The boys tried to shove Appellant off but could not budge him. Appellant got up, though, and exited the front door. A. locked the door behind him, returned to bed, and he and his brother eventually drifted back to sleep.

A. was the first to awaken in the morning. He saw his mother lying on the side of the bed; she did not look okay. He thought N. was dead because there was blood on N.s' [sic] face and clothes, and he did not wake up easily. Eventually, N. woke up, and when he touched his mother—she felt frozen. The boys ran to their sisters' room.

J.J. did not believe them when they told her that they thought their mother was dead. But after looking in on her and finding her cold, J.J. called 911.

Officers arrived and taped off the driveway, yard, and part of the street. Inside the house, they found bloodstains on the front door. In the master bedroom, they discovered Alma's body partially on the bed. She had multiple wounds on her chest and neck. Some were not very deep, surface-type wounds. Others were penetrating, "incise wounds made by a very sharp object." Beneath her shoulder, the officers found a kitchen knife with blood on it—the blade slightly bowed, and the tip bent.

Outside, on the roof where earlier Robert had seen Appellant crouching, officers noticed that the wooden slats that normally would cover the gable had been

3

removed, leaving a space large enough for a person to squeeze through into the attic. Inside the attic, a beam on the floor ran directly to a plywood panel that covered an opening into the boys' room, which had been converted from the garage some time before.

In the boys' room, the panel was in its place in the ceiling. But dust and bits of insulation matching the attic insulation were on the floor around a dresser that sat directly below the panel, close enough so that a person climbing out of the attic could use the dresser as a step. In the dust on top of the dresser, officers observed a "shoe transfer impression." And from the dust on the floor in front of the dresser, the officers lifted a partial right shoeprint.

While those officers were investigating the scene on Carnett Court, others were dispatched to a reported attempted suicide nearby. When the officers arrived, they found Appellant on a stretcher inside an ambulance, with his wrists cut. His wounds were serious, though not life-threatening, and he was transported to the hospital. Appellant asked an officer if his kids were okay and said that his wife had left him for another man.

Officers arrested Appellant for murder. Among his effects they seized were a pair of black K-Swiss tennis shoes and a key ring with seven keys. None of the keys on the key ring fit any of the locks at the house on Carnett Court. The general design, size, and tread pattern of Appellant's right tennis shoe, however, were indistinguishable from those of the print lifted from the floor of the boys' room.

The medical examiner ruled Alma's death a homicide, having determined that its cause was two wounds made with a sharp object that had transected the left common carotid artery and the vein next to it.

The State waived the death penalty, and Appellant was tried for capital murder. At the close of the State's evidence, Appellant moved for a directed verdict, which the trial court denied. The jury found Appellant guilty, and the trial court sentenced him to life.

Mem. Op. 2-7, ECF No. 13-3.

The state appellate court affirmed the trial court's judgment on appeal, and the Texas Court of Criminal Appeals refused Petitioner's petition for discretionary review. Docket Sheet 1, ECF No. 13-2. Petitioner also filed a state habeas-corpus application raising his ineffective-assistance-of-counsel claims, which was denied by the Texas Court of Criminal Appeals without written order on

4

the findings of the trial court. Writ Rec'd & Action Taken, ECF Nos. 13-19, 13-20 & 13-21.

## II. ISSUES

In this federal petition, Petitioner raises three grounds for relief: ineffective assistance of trial counsel (ground one) and trial court error (grounds two and three).

## III. RULE 5 STATEMENT

Respondent admits that Petitioner filed the petition in a timely manner and has sufficiently exhausted his state-court remedies. Resp't's Ans. 8, ECF No. 12. The petition is not a second or successive petition.

## IV. DISCUSSION

### A. Legal Standard for Granting Habeas-Corpus Relief

A § 2254 habeas petition is governed by the heightened standard of review provided for in the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as established by the Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court. 28 U.S.C. § 2254(d)(1)-(2); *Harrington v. Richter,* 562 U.S. 86, 100 (2011). This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Harrington*, 562 U.S. at 102. Additionally, the statute requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. A petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1);

5

*Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 399 (2000). Finally, when the Texas Court of Criminal Appeals denies a federal claim in a state habeas-corpus application without written opinion, a federal court may presume "that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary" and applied the correct "clearly established federal law, as determined by the Supreme Court of the United States," unless there is evidence that an incorrect standard was applied, in making its decision. *Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Harrington*, 562 U.S. at 99; *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2004).

### B. Ineffective Assistance of Trial Counsel

Under his first ground, Petitioner claims he received ineffective assistance of trial counsel. A criminal defendant has a constitutional right to the effective assistance of counsel at trial. U.S. CONST. amend. VI, XIV; *Evitts v. Lucey*, 469 U.S. 387, 393-95 (1985); *Strickland v. Washington*, 466 U.S. 668, 688 (1984). To establish ineffective assistance of counsel a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688. Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance. *Id.* at 687, 697. In applying this standard, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance or sound trial strategy. *Id.* at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689. The Supreme Court recently emphasized in *Harrington v. Richter* the manner in which a federal court is to consider an ineffective-assistance-of-counsel claim raised in a habeas petition subject to

AEDPA's strictures:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

562 U.S. at 101 (quoting *Williams v. Taylor,* 529 U.S. 362, 410 (2000) (emphasis in original)). Accordingly, it is necessary only to determine whether the state courts' adjudication of Petitioner's ineffective-assistance claims was contrary to or an objectively unreasonable application of *Strickland. Bell v. Cone,* 535 U.S. 685, 698-99 (2002); *Kittelson v. Dretke,* 426 F.3d 306, 315-17 (5th Cir. 2005); *Schaetzle v. Cockrell,* 343 F.3d 440, 443 (5th Cir. 2003).

At trial, Petitioner was represented by Wes Ball and Santiago Salinas, both highly experienced in criminal law. Petitioner claims trial counsel were ineffective by (1) conceding his guilt before the jury and (2) failing to investigate the facts and seek out and present an expert witness regarding the probability of misidentification by the eyewitnesses, the reliability of the "crime lab results" pertaining to the unknown partial shoe imprint and the blood found on the front doorknob, and the impossibility of Petitioner entering the residence through the roof vent due to his size. Pet. 6, ECF No. 1; Pet'r's Am. Mem. 10, ECF No. 6.

Wes Ball, a board certified specialist in criminal law since 1985, filed an affidavit in the state habeas proceeding, responding to Petitioner's allegations as follows:

> I was appointed to represent Mr. Dominguez on or about March 17, 2009 . . . . Following my appointment, since the death penalty had not been waived, I requested the appointment of additional counsel pursuant to the rules regarding

appointment of counsel in capital murder cases. The trial court appointed the Honorable Santiago Salinas. . . . Mr. Salinas' appointment was important due to the fact that witnesses, family members and others had as their primary language, Spanish. This appointment occurred on April 8, 2009. Mr. Salinas came with the additional qualification in that he is fluent in the Spanish language. In addition to Mr. Salinas, I requested and had approved the appointment of a private investigator to assist in the defense of this case on May 21, 2009. Mr. Gilbert Torrez was appointed by the trial court to assist the defense. . . . We also obtained the services of a mental health professional to examine our client concerning his mental status. We obtained by subpoena many records pertaining to the case and our client. We both visited the crime scene to examine the locations that were relevant.

Following my appointment, I began gathering evidence, including discovery material obtained from the District Attorney. I began obtaining this evidence two days following my appointment. The discovery materials received include at least 12 discs of digital media (CDs and DVDs) and voluminous written documentation. Mr. Salinas and I met with Mr. Dominguez a number of times to review the evidence and get his response to the charges pending against him. In these meetings, Mr. Dominguez acknowledged being present at the time of the victim's death. Mr. Dominguez initially claimed that the stabbing death of the victim was accidental. Mr. Salinas and I paid particular attention to the injuries inflicted on the deceased and the available information concerning those injuries, including the official autopsy report. On July 1, 2010, Mr. Salinas and I met with Dr. Gary Sisler, Deputy Medical Examiner to review the autopsy and injuries that were inflicted on the victim. It was abundantly clear from this meeting and the autopsy reports and other evidence that the injuries to the victim were not accidentally inflicted. The amount of force used was completely inconsistent with the version of events initially reported to us by our client. We had an additional meeting with out client on July 26, 2010 to discuss our findings. At that meeting, we also made arrangements to play recorded interviews of the defendant's twin sons. These two boys were in the bed with their mother at the time she was attacked and killed. They awoke to find her body. We wanted our client to see what would likely be the content of their testimony.

One of the complaints lodged by Mr. Dominguez in support of his claim of ineffective assistance of counsel concerns the strategy employed in the defense of his case. He claims that defense counsel stated that he was guilty of murder, not capital murder. Mr. Salinas and I were not ineffective in any of the strategy that we employed in our efforts to defend this case. It became clear that a defense that Mr. Dominguez was not the party responsible for the victim's death would be ludicrous based on the evidence the jury would hear and likely believe. This was coupled with the fact that Mr. Dominguez acknowledged his responsibility to us in attorney-client meetings. The only viable defense strategy that provided *any* chance of success was to focus on efforts to cast doubt that this case was a capital murder. This strategy is fairly common in the defense of capital murder cases where evidence that the

8

defendant is the responsible actor in fairly overwhelming. Employment of this strategy, if successful results in a sentence for a lesser offense. If we could get a verdict of murder, we would be in a position to raise "sudden passion" to further reduce out client's exposure. The goal is to avoid conviction and a sentence for the main charge of capital murder. Both in opening statement and final argument, I employed this strategy, by conceding the obvious and focusing on the issues that might persuade the jury to consider the lesser offense of murder. The fact that the strategy proved unsuccessful does not mean it was not the most reasonable strategy.

Mr. Dominguez claims that we were ineffective for failing to conduct investigation into the facts of the case by failing to seek out and present Expert Witnesses concerning three issues: The first issue concerns the misidentification by the eyewitnesses. I am particularly familiar with errors in eyewitness identification evidence and testimony. I was counsel for the appellant in one of the central Texas cases on this issue and a case relied on by Mr. Dominguez in his writ application. I represented the appellant in Jordon v. State, 928 S.W.2d 550 (Tex. Crim. App. 1996). I have continued to follow this issue during the course of my practice of criminal defense law. The errors that can occur in eyewitness identification are situations where the identified party is a stranger to the eyewitness. While many of these identifications may be accurate, there are errors that can occur due to faulty identification procedures employed by police investigators, issues concerning race and other issues that are well described in the research literature on this issue. In the instant case, we had a situation where the person identified was not a stranger to the eyewitnesses, but was the parent of the eyewitnesses. The children of Mr. Dominguez identified him as being in their mother's bed in a physical fight with her at or near the time of her death. This testimony was in my opinion not subject to expert witnesses on eyewitness identification. It was our opinion that the identity of the actor was not an issue that would be accepted by any jury hearing the evidence in this case. While I have challenged identification in cases where my client has acknowledged guilt in attorney-client privileged conversations, this has been in cases where the identification has been of someone not known to the witness. It is my opinion that failure to employ or use an expert on eyewitness identification was not ineffective assistance of counsel in this case. It is my opinion that a strategy of trying to cast doubt on the identity of the actor would have been ineffective and extremely poor strategy, based on the facts of this case.

The second issue Mr. Dominguez raises to support his claim of ineffective assistance of counsel is failing to present evidence concerning the reliability and/or error rate of crime lab results. Mr. Dominguez appears to attack the testimony of Dr. Ron Fazio who testified concerning a shoe impression left at the crime scene. A fair reading of Mr. Dominguez' complaint would lead the reader to believe that Dr. Fazio's testimony was that Mr. Dominguez's shoe left the impression at the crime scene. A review of Dr. Fazio's testimony clearly shows that Dr. Fazio left no such impression. Dr. Fazio testified that Mr. Dominguez' shoe could neither be included

9

nor excluded from the evidence impression. Mr. Salinas and I were aware of the limitations in Dr. Fazio's opinion concerning the shoe impression. Based on this awareness that Dr. Fazio was not going to connect our client's shoe to the evidence impression, there was nothing about his testimony that we considered harmful to our defense. I am quite familiar with the reports referenced by Mr. Dominguez by the National Academy of Sciences concerning the limits, error rates and other data concerning forensic evidence. I maintain a copy of those reports in my law office. As is frequently the case, the District Attorney was not presenting Dr. Fazio's testimony for any probative value concerning out client's guilt. They were presenting it to show the jury that they "tried" to find out its evidentiary value to the case. This was done to foreclose our ability to argue that they did a poor job of investigation. No expert was required to deal with the testimony of Dr. Fazio as it had basically zero probative value.

Mr. Dominguez argues in his third point in support of ineffective assistance of counsel is the "impossibility" of him entering into the residence through a roof-vent due to his weight and height. Mr. Dominguez claims that crime scene officer Scheiern testified that the point of entry into the home was through the roof-vent . . . . An examination of the official trial record shows that Officer Scheiern did not testify that the opening was the point of entry. She testified to its size and that an adult might be able to squeeze through the opening. Mr. Dominguez goes on to state that we did not rebut the officer's testimony concerning the possibility of entry through the roof opening by presenting either an expert or evidence of his size which he reports as being 5'9" and 190 pounds with a shoulder width of 19 1/4 inches. A review of materials available to the defense at trial, including records from the Tarrant County Sheriff (including jail records and fingerprint card) and Fort Worth Police Department report Mr. Dominguez to be 5'6" in height with a weight of 150 pounds. Naturally, his shoulder size is not documented. These official measurements are consistent with my recollection of my client's size. While one of the State's theories was that our client entered the residence through the opening in the roof, there was no witness that testified that our client could have made it through the opening in the roof. We argued vigorously against that theory, while at the same time noting that the house was owned by our client as community property and thus his manner of entry was of little consequence. It was my opinion at the time of trial based on my observations of our client and his size, and the size of the opening that our client could have "possibly" squeezed in through the opening in the roof, but it was unlikely. The evidence presented by the prosecution did not detract from my opinion. I am not aware of any individual in forensic science that has a particular expertise concerning whether a person can fit through a particular opening. It is simply a matter of measurements and common sense observation. We were not ineffective regarding the issue of the roof-vent theory of entry into the house. We cross examined the witness on this issue. The witness had not offered an opinion on whether our client entered the home at that point. We argued what the evidence showed and more succinctly what it did not show regarding that point of entry.

> My representation of Mr. Dominguez at trial was not ineffective. I provided Mr. Dominguez effective assistance of counsel. I am aware of no action that could have been taken that would have changed the outcome of the trial. I note in the official trial record, the comments of Mr. Dominguez concerning his trial. He was asked if he had any questions, and whether he agreed with our decision to rest behind the State. He agreed with our strategy, noting during his answers, "everything is fine." He was further asked whether he had any complaints concerning Mr. Salinas or my representation of him. His answer was "no."

Writ Rec'd 117-23, ECF No. 13-19 (emphasis in original) (record citations omitted).

Santiago Salinas, who has practiced criminal law for over thirty years, also filed an affidavit in the state habeas proceedings responding to Petitioner's allegations as follows (all spelling, punctuation, and/or grammatical errors are in the original):

> There were many meetings with Mr. Dominguez, beginning on the day of my appointment to the day of the jury verdict. A Spanish-speaking investigator was appointed to assist the defense team. All members of the family of Mr. Dominguez were interviewed. Employment records and bank records were obtained and reviewed. A mental health professional was obtained to examine Applicant. All discovery was turned over by the State and duly reviewed by the defense team. The defense team met with Dr. Gary Sisler, from the Medical Examiner's office, who did the autopsy on Alma Garcia, and who gave his opinion as to whether this could have been an accidental event, or not. All of this was discussed with Applicant and at no time was there any indicia of evidence directed at the possibility that a third party was the true killer of Alma Garcia, not from Applicant or from any member of his family. There was also no evidence discovered of the existence of another man being romantically involved with Alma Garcia, although it was Applicant's honest belief that he existed.
>
> This resulted in a strategy that this was a crime of passion and that this was not a capital murder case, and not a true burglary, since it was defense contention that Applicant was an owner of this particular home where the event occurred and that no break-in occurred since our information obtained was that Applicant was allowed entry to his home by his sons, or he made his own way inside through the front door (per information from the mental health specialist). There was an attempt to plea bargain the case, and Applicant was willing to plead guilty, but for no more than fifteen (15) years. As a result this case had to be tried to a jury, and all the risks were explained to Mr. Dominguez.
>
> After the State rested, Applicant did not testify, although his testifying was

an option duly discussed with him, and his testifying was part of the strategy before trial began. From our many conversations with our client, it seemed that this was a crime of passion, which meant that this was an intentional act, versus an accidental non-intentional act. Mr. Dominguez was given the option to testify and he declined, and based on our conversations with him, we had to agree with that decision.

### Ground One: Attorney Wes Ball acknowledging guilt on Murder, but not Capital Murder

We anticipated that the evidence presented by the State was going to be strongly directed at Applicant, but we disagreed with the State that this was a Capital case. We anticipated that Applicant was going to testify, to explain the ownership of the home in question. The evidence was very strong and pointed to Applicant as the one who caused the death of his common law wife. This was our strategy, that this was a case of murder and not capital murder, and if we had succeeded, that this was a crime of passion, and possibly, Mr. Dominguez could have testified at that time. Although our information indicated that he would have a hard time admitting to an intentional act of "sudden passion", as opposed to this being an accidental act. The strategy was sound and was the best way to possible get to a conviction for a lesser charge.

### Ground Two: Failure to obtain an Eyewitness Identification Expert

This was not an "identification" case. Identification was not an issue. Applicant would have us obtain an expert to question the identification of him by his sons, when he admitted to us that his sons let him into the house.

Identification experts are playing a bigger role in the criminal justice system. But those are cases involving stranger on stranger contacts. This was not the case here. This was never an issue that was subject to expert witness testimony.

### Ground Three: Failure to obtain an expert witness on reliability of crime lab results

Lab results did not produce the evidence that Mr. Dominguez was the guilty party. It was direct evidence from the witness stand regarding his own sons. There was nothing in controversy that required an expert.

Ron Fazio testified regarding shoe imprint, but he could not say that it matched or did not matched Mr. Dominguez. Our information from Applicant was that he had continued to visit his home and do repairs on his house and attic, and to have his footprints there would not have been a surprise. Even the State's expert could not say for sure that he had been there based on the imprint.

12

> The blood/DNA testimony, specifically Witness Farah Plopper, indicated the presence of dna of family members, Alma Garcia, Abel Dominguez, and the sons on the door knob and dead bolt of the door. This was expected based on the information that Applicant had provided about him being allowed into the house by his sons, and him admitting to his exit after the event.
>
> We did not see an issue present where the need to get a dna expert was required.
>
> **Ground Four: Failure to obtain an expert on the impossibility of Applicant entering the home through the roof vent due to his size**
>
> Affiant remembers Applicant as being small size and not as he now claims on this complaint, that is, that he is 5'9", and 190 pounds. Applicant always denied entry via the vent, and insisted to us that his boys let him in through the front door and that he waited for Alma to come home. According to our mental health expert he told her a different version, that is, that he let himself in through the front door. Even if true, our argument was that he cannot break into his own home.
>
> Attached to this response is Exhibit A, which is the printout of the booking information of the Tarrant County Sheriff regarding Applicant, with the "LAST UPDATE 3/13/09" --- listing him as: Hgt 506  Wgt 150
>
> In conclusion, I feel that Mr. Abel Dominguez was duly represented to the best of our combined sixty years plus of experience between us, and that we were not ineffective in our representation of him.

*Id.* at 124-27.

The state habeas court entered factual findings consistent with counsel's affidavits and, applying the *Strickland* standard, entered the following legal conclusions:

7. Counsel's decision to concede guilt on murder was the result of reasonable trial strategy.

8. In light of the fact that the eyewitnesses were Applicant's own children, counsel's decision to not present expert witness testimony regarding the probability of misidentification of eyewitnesses was the result of reasonable trial strategy.

9. Counsel's decision to not seek out and present expert witnesses on the reliability and/or error [r]ate of the crime lab results was the result of reasonable trial strategy.

13

10. Because of the possibility that Applicant could squeeze into the roof opening, and there is no evidence that is an expert that would testify that it was impossible for Applicant to enter through the roof, the decision to just argue that Applicant did not enter through the roof and not present expert witness evidence was the result of reasonable trial strategy.

11. Applicant has failed to prove that his attorney's representation fell below an objective standard of reasonableness.

. . .

14. Applicant has failed to show that there is a reasonable probability that the result of the proceeding would have been different had counsel not argued that Applicant was guilty of murder.

15. Applicant has failed to show that there is a reasonable probability that the result of the proceeding would have been different had counsel attacked the eyewitness testimony.

16. Applicant has failed to show that there is a reasonable probability that the result of the proceeding would have been different had counsel presented expert witnesses attacking the crime lab results.

17. Applicant has failed to show that there is a reasonable probability that but for the alleged acts of misconduct, the result of the proceeding would be different.

18. Applicant has failed to prove that he received ineffective assistance of trial counsel.

SH01 Writ Rec'd 142-43, ECF No. 13-19 (citations omitted).

In turn, the Texas Court of Criminal Appeals denied habeas relief based on the trial court's findings. *Id.*, Action Taken, ECF No. 13-21. Petitioner fails to rebut the presumptive correctness of the state courts' factual findings with clear and convincing evidence or demonstrate that the state courts' application of *Strickland* was objectively unreasonable.

Petitioner asserts that, instead of using the chosen strategy, counsel should have employed a "misidentification" strategy based on inconsistencies in his sons' testimonies. Pet'r's Am. Mem.

3-13, ECF No. 6. However, strategic decisions made by counsel "after thorough investigation of the facts and law relevant to plausible options are virtually unchallengeable" on federal habeas review. *Strickland,* 466 U.S. at 690. Federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise. *Strickland,* 466 U.S. at 689. Furthermore, the Fifth Circuit has regularly rejected ineffective-assistance-of-counsel claims where counsel employs a trial strategy conceding guilt. *Haynes v. Cain*, 298 F.3d 375, 382 (5th Cir. 2002) (partial concession of guilt was a strategy that "proved effective in avoiding the death penalty for their client"); *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002) ("counsel's tactic may have been the best available"); *Kitchens v. Johnson*, 190 F.3d 698, 704 (5th Cir. 1999) (conceding to murder and arguing in closing that the defendant had committed a "very brutal, a very savage murder, but [ ] not a capital murder . . ." was a valid strategic decision "in an effort to bolster his credibility with the jury"). In this case, counsel's conduct in conceding Petitioner's guilt in an attempt to get the jury to find him guilty of the lesser offense of murder was explained as trial tactic. Although it was ultimately unsuccessful, it was logical when the overwhelming strength of the state's case is considered and there is no indication that Petitioner's theory might have been more effective.

Additionally, the Fifth Circuit has repeatedly held that complaints of uncalled witnesses are not favored in federal habeas-corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative. *Day v. Quarterman,* 566 F.3d 527, 538 (2009). To prevail on such a claim, a petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense. *Id.* This showing is required for claims regarding both

15

uncalled lay and expert witnesses alike. *Id.* Petitioner makes no such showing. Thus, his ineffective-assistance claim based on failure to present expert witnesses is entirely speculative. Further, it is highly unlikely that expert testimony regarding the matters raised by Petitioner would have been favorable to a particular defense or resulted in Petitioner's acquittal. The record is devoid of any evidence implicating another person(s) in Alma's murder and the boys were confident in their identification of their father. Further, Petitioner wholly fails to demonstrate how a defense expert on the "crime lab results" would have refuted the conclusions of the state's experts. Finally, whether a person of Petitioner's size and stature could fit through a 28-inch by 10-inch triangular-shaped opening is not a subject that lends itself to the traditional use of expert testimony. *See Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 56 (1973). Such testimony is usually admitted for the purpose of explaining to lay jurors what they otherwise could not understand. *Id.* No such assistance was needed by jurors for the determination of the question.

### C. Trial Court Error

Under his second ground, Petitioner claims the trial court erred by denying his motion for a directed verdict because the evidence did not show that Alma had a greater right of possession to their residence to support the state's charge that the murder was committed during burglary of a habitation. Pet. 6, ECF No. 1; Pet'r's' Am. Mem. 13, ECF No. 6. Essentially, Petitioner argues that the state presented insufficient evidence to support the charge of capital murder. A challenge to the sufficiency of the evidence can support a claim for habeas relief only if the evidence, when viewed in the light most favorable to the State is such that no reasonable fact finder "could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979).

16

Applying *Jackson* and relevant state law, the state appellate court addressed this claim as follows:

> Appellant contends that the trial court erred by denying his motion for directed verdict because the evidence did not show that Alma had a greater right to possess the house that Appellant broke into than he did. Since she did not have the greater right of possession, the argument goes, he could not have committed burglary–the element that raised the offense to capital murder–because he could not burglarize his own home.
>
> Under the penal code, a person commits burglary if, without the effective consent of the owner, the person enters a habitation and commits a felony, theft, or an assault. "Owner" is defined in the penal code in three different ways: a person is an owner if she has (1) "title to the property," (2) "possession of the property, whether lawful or not," or (3) "a greater right to possession of the property than the actor."
>
> The jury charge tracked the penal code definitions of owner. Given the charge, therefore, the jury was authorized to find that Alma was the owner if she had title, lawful or unlawful possession, or a greater right to possession. Viewed in the light most favorable to the verdict, the evidence supports a reasonable juror's belief beyond a reasonable doubt that Alma was the owner because the evidence shows that she had a greater right to possession than Appellant *and* that at the time he entered the house without her effective consent, she had possession of the house, lawfully or otherwise.
>
> The evidence showed that Alma had a greater right to possession than Appellant because Blanca testified that she signed the mortgage "for Alma" and reminded Appellant on numerous occasions that Blanca owned the house and that Appellant should leave Alma and the children there in peace.
>
> Moreover, whether or not the evidence showed that Alma had a greater right of possession, it showed that at the time of the offense she had possession of the house, lawfully or not, and that Appellant did not. "Possession" was correctly defined in the jury charge as actual care, custody, control, or management. The evidence showed that Appellant moved out of the house more than a week before the murder, that Alma changed the locks, that Appellant did not have a key that fit, that he was seen skulking around the backyard and on the roof, that he tried to get in the house by coming in a window, and that he eventually did get in by climbing onto the roof, going through a gable, and then dropping down into the boys' room through the attic access. Thus, viewed in the light most favorable to the verdict, a reasonable juror could have concluded that at the time Appellant broke into the house, Alma had actual care, custody, control, or management of it and therefore possession. Because

17

> it is reasonable to conclude from the evidence that Alma had possession of the house, and thus was the owner as defined by the penal code and in the jury charge, we hold that the trial court did not err by denying Appellant's motion for directed verdict on this issue.

Mem. Op. 7, 9-12, ECF No. 13-3 (citations and footnote omitted).

Federal courts must defer to state court interpretations of state law. *See Weeks v. Scott,* 55 F.3d 1059, 1063 (5th Cir. 1995); *Reddix v. Thigpen,* 805 F.2d 506, 511 (5th Cir. 1986). Deferring to the state courts' interpretation of its own law in this case, the state court's determination of the claim was a reasonable application of *Jackson.*

Under his third ground, Petitioner claims the trial court erred by not giving the jury an instruction pertaining to Texas Family Code § 3.001 through § 3.003 and § 3.102 setting out the rights of possession of husband and wife in the State of Texas. Pet. 7, ECF No. 1. The state appellate court determined that these family code provisions were not applicable to Petitioner's case because ownership in a criminal prosecution for burglary is defined by the Texas penal code, which takes precedence over civil statutes in criminal proceedings. Mem. Op. 12-13, ECF No. 13-3. *See* TEX. PENAL CODE ANN. § 1.07(a)(35)(A); TEX. R. EVID. 101(c). This claim raises a purely state-law matter, which is binding on this Court. *Bradshaw v. Richey,* 546 U.S. 74, 76 (2005); *Amador v. Quarterman,* 458 F.3d 397, 412 (5th Cir. 2006).

## VI. CONCLUSION

For the reasons discussed herein, Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **DENIED**. Further, for the reasons discussed, a certificate of appealability is **DENIED** as Petitioner has not made a showing that reasonable jurists would question this Court's resolution of Petitioner's claims.

**SO ORDERED** on this 26th day of July, 2017.

_____
Reed O'Connor
UNITED STATES DISTRICT JUDGE